## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION (CINCINNATI)

|  |  |  |
|---|---|---|
| PAIGE C.,[1] | : | Case No. 1:25-cv-00072 |
|  | : |  |
| Plaintiff, | : | District Judge Michael R. Barrett |
|  | : | Magistrate Judge Caroline H. Gentry |
| vs. | : |  |
|  | : |  |
| COMMISSIONER OF SOCIAL | : |  |
| SECURITY, | : |  |
|  | : |  |
| Defendant. | : |  |

## REPORT AND RECOMMENDATION[2]

Plaintiff filed an application for Child's Insurance Benefits and Supplemental Security Income (SSI) in April 2022. Plaintiff's claims were denied initially and upon reconsideration. After a hearing at Plaintiff's request, the Administrative Law Judge (ALJ) concluded that Plaintiff was not eligible for benefits because she was not under a "disability" as defined in the Social Security Act. The Appeals Council denied Plaintiff's request for review. Plaintiff subsequently filed this action.

Plaintiff seeks an order remanding this matter to the Commissioner for the award of benefits or, in the alternative, for further proceedings. The Commissioner asks the Court to affirm the non-disability decision. For the reasons set forth below, it is

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

[2] *See* 28 U.S.C. § 636(b)(1). The notice at the end of this opinion informs the parties of their ability to file objections to this Report and Recommendation within the specified time period.

recommended that the Court REVERSE the Commissioner's decision and REMAND for further proceedings.

## I.     BACKGROUND

Plaintiff asserts that she has been under a disability since March 28, 2022.[3] At that time, she had not yet attained the age of twenty-two.[4] For the purposes of eligibility for SSI, she was twenty years old on the application date.[5] She was therefore considered a "younger person" under the Social Security regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c).[6] Plaintiff has a "high school education and above." *See* 20 C.F.R. § 404.1564(b)(4).

The evidence in the Administrative Record ("AR," Doc. No. 6) is summarized in the ALJ's decision ("Decision," Doc. No. 6 at PageID 31-59), Plaintiff's Statement of Errors ("SE," Doc. No. 7), the Commissioner's Memorandum in Opposition ("Mem. In Opp.," Doc. No. 10), and Plaintiff's Reply Memorandum ("Reply," Doc. No. 11). Rather

---

[3] The ALJ stated in the Jurisdiction and Procedural History section: "In both applications, [Plaintiff] alleged disability beginning January 27, 2023." (Decision, Doc. No. 6-2 at PageID 34.) But elsewhere in the decision, the ALJ listed an alleged disability onset date of March 28, 2022. (*Id.* at PageID 36, 53.) Both of Plaintiff's applications confirm that Plaintiff alleges a disability onset date of March 28, 2022. (AR, Doc. No. 6-5 at PageID 211, 218.)

[4] Social Security regulations provide for the payment of Disabled Child's Insurance Benefits if the claimant is eighteen years old or older and has a disability that began before attaining age twenty-two. *See* 20 C.F.R. § 404.350(a)(5).

[5] Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. And so the relevant period of consideration for Plaintiff's SSI application begins on April 20, 2022. *See* 20 C.F.R. § 416.335; *Koster v. Comm'r of Soc. Sec.*, 643 Fed. Appx. 466, 478 (6th Cir. 2016) ("For purposes of SSI, which is not retroactive, the relevant period here is . . . the date [Plaintiff] filed his protective application.").

[6] The remaining citations will identify only the pertinent Disabled Child's Insurance Benefits Regulations, as they are similar in all relevant respects to the corresponding SSI Regulations.

than repeat these summaries, the Court will discuss the pertinent evidence in its analysis below.

## II. STANDARD OF REVIEW

The Social Security Administration provides Disabled Child's Insurance Benefits and SSI to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a). The term "disability" means "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id*.

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the

agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## III.    FACTS

### A.    The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to Plaintiff's applications for benefits. In doing so, the ALJ considered each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 404.1520. The ALJ made the following findings of fact:

| | |
|---|---|
| Step 1: | Born in 2002, Plaintiff had not attained age twenty-two as of March 28, 2022, the alleged onset date. |
| | Plaintiff has not engaged in substantial gainful activity since the alleged onset date. |
| Step 2: | She has the severe impairments of endometriosis, Ehlers-Danlos Syndrome (EDS), positional orthostatic tachycardia syndrome (POTS), fibromyalgia, posttraumatic stress disorder (PTSD), bipolar depression, generalized anxiety disorder, and gastroparesis. |
| Step 3: | She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. |
| Step 4: | Her residual functional capacity (RFC), or the most she can do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of light work as defined in 20 C.F.R. § 404.1567(b), subject to the following limitations: "frequently climb ramps [and] stairs[;], occasionally climb ladders, ropes, [and] scaffolds; frequently stoop, kneel, [and] crouch[;] occasionally crawl; no exposure to commercial driving, hazardous moving machinery, or unprotected heights. She is able to concentrate[,] persist, [and] maintain pace for two-hour intervals [through a] normal workday/workweek while performing detailed and complex tasks; and is able to adapt to occasional changes in the workplace." |
| | She has no past relevant work. |

Step 5:     Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform.

(Decision, Doc. No. 6-2 at PageID 36-52.) These findings led the ALJ to conclude that Plaintiff does not meet the definition of disability and so is not entitled to benefits. (*Id.* at PageID 52-53.)

## B.     The ALJ's Symptom Severity Analysis

After describing the applicable legal standard, the ALJ summarized Plaintiff's symptoms, subjective complaints, and reports of difficulty with daily activities, including Plaintiff's testimony during the October 2023 hearing. (Decision, Doc. No. 6-2 at PageID 39-41.) The ALJ also summarized the medical records and acknowledged the subjective complaints and daily activities that Plaintiff reported to her medical providers. (*Id.* at PageID 41-45.) Additionally, the ALJ described the medical opinions and prior administrative findings in the record. (*Id.* at PageID 46-51.)

The ALJ concluded that although Plaintiff's impairments could reasonably be expected to cause her symptoms, the "intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record …." (Decision, Doc. No. 6-2 at PageID 46.) The ALJ initially addressed Plaintiff's Ehlers-Danlos Syndrome (EDS) and acknowledged that she complained of complications such as recurrent rib dislocations, a foot injury, a hip dislocation, a sprained ankle, and a left shoulder injury. (*Id.* at PageID 45.) The ALJ discounted Plaintiff's complaints by citing several normal imaging reports, such as knee x-rays, a left knee MRI, left shoulder x-rays, left foot x-rays, and cervical spine x-rays. (*Id.*) The ALJ also noted that Plaintiff

6

had "therapy for various joints" and concluded that "[o]verall, [Plaintiff's] EDS is managed conservatively." (*Id.*)

Next, the ALJ acknowledged Plaintiff's complaints of fibromyalgia and positional orthostatic tachycardia syndrome (POTS). (Decision, Doc. No. 6-2 at PageID 46). The ALJ did not cite any evidence to discount complaints related to these conditions:

> [Plaintiff] also has several symptoms of fibromyalgia, which a rheumatologist considered a differential diagnosis (e.g., 1F/22). Specifically, [Plaintiff] reported chronic widespread pain, brain fog, and exhibited joint swelling, and myalgia (e.g., 6F/178; 9F/14-15).
>
> [Plaintiff] also has POTS (1F/12). Clinicians have advised her to exercise, drink water, and increase salt-intake to treat this condition (e.g., 16F/210).

(*Id.*)

With regard to Plaintiff's endometriosis, the ALJ acknowledged that Plaintiff underwent surgery and received injections for the condition prior to the alleged disability onset date. (Decision, Doc. No. 6-2 at PageID 46.) He also acknowledged that Plaintiff discontinued the injections in early 2022 "because of side effects and concerns over complications (3F/40 see also 16F/81)." (*Id.*) The ALJ further noted: "A gynecologist indicated that [Plaintiff's] pelvic pain would not benefit from further surgery and prescribed [Plaintiff] diazepam instead (1F/111). She has also taken suppository medication for this condition (2F/60)." (*Id.*)

The ALJ concluded his discussion of Plaintiff's physical impairments by explaining his inclusion of certain physical limitations in the RFC:

> Due to [Plaintiff's] gastroparesis and low nutrition status as well as EDS complicated by fibromyalgia and POTS, she can perform light work except frequently climb ramps, stairs; and frequently stoop, kneel, crouch. Her

7

> POTS would limit her further to occasionally crawl to avoid positional orthostatic complications. Moreover, due to her EDS and POTS, as well as additional challenges from her endometriosis and gastroparesis including abdominal pain as well as incontinence issues per her testimony, for additional precautions, she should have no exposure to commercial driving, hazardous moving machinery, or unprotected heights; she could occasionally climb ladder[s], ropes, [and] scaffolds.

(Decision, Doc. No. 6-2 at PageID 46.)

The ALJ also addressed Plaintiff's mental impairments and concluded that they were "somewhat managed on medications albeit she reported decreased concentrations, which has been noted by her clinician as well." (Decision, Doc. No. 6-2 at PageID 46.) The ALJ then explained his inclusion of a few mental restrictions in the RFC:

> Her moderate problems for concentration, persistence, and pace would not jeopardize her ability to concentrate[,] persist, [and] maintain pace for two-hour intervals, although her chronic pain and other complicating factors that contributes [sic] to her anxiety and depression would limit her to detailed and complex tasks. Her PTSD symptoms are sparsely mentioned albeit accommodated further such that she is able to adapt to occasional changes in the workplace to avoid exacerbations.

(*Id.*)

## C.    The ALJ's Hypothetical and Vocational Expert Testimony

The ALJ asked the vocational expert (VE) at the October 2023 hearing whether an individual with Plaintiff's vocational profile (i.e., the same age, education, and work history) and the RFC identified in the decision could perform any other work in the national economy. (AR, Doc. No. 6-2 at PageID 89-90.) The VE testified that such an individual could perform the following light, unskilled (Specific Vocational Preparation (SVP) of 2) jobs: Cashier, Dictionary of Occupational Titles (DOT) code 211.462-010, approximately 456,000 positions nationally; Marker, DOT code 209.587-034,

approximately 137,000 positions nationally; and Routing Clerk, DOT code 222.687-022, approximately 118,000 positions nationally. (*Id.* at PageID 90.) The VE further testified that even if the hypothetical individual could perform only sedentary work—with all the other limitations remaining the same—such an individual could perform the following sedentary, semi-skilled (SVP of 3) jobs: Check Cashier, DOT code 211.462-026, approximately 390,000 positions nationally; Appointment Clerk, DOT code 237.367-010, approximately 146,000 positions nationally; and Phone Solicitor, DOT code 299.357-014, approximately 107,000 positions nationally. (*Id.* at PageID 91.)

The ALJ asked the VE whether her testimony was consistent with the information contained in the DOT. (AR, Doc. No. 6-2 at PageID 94.) The VE responded: "It is except in areas not addressed by the DOT and its companion publications, and those areas that we talked about would be the climbing of ladders, ropes, and scaffolds, the use of a cane, change of position, off-task behavior, and absenteeism, and for all of those areas, I used my education, training, and experience." (*Id.*)

The ALJ cited this testimony to support his conclusion that Plaintiff is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and is not disabled. (Decision, Doc. No. 6-2 at PageID 52-53.)

Additionally, the VE testified in response to additional hypothetical questions that if such an individual needed to change positions between sitting and standing every twenty minutes, the number of jobs provided in response to prior hypothetical questions would be reduced by half. (AR, Doc. No. 6-2 at PageID 92.) She testified that the need to "get up and walk around periodically" (defined as every twenty minutes for five minutes

9

at a time while being off task) would preclude competitive employment. (*Id.* at PageID 92-93.) The VE also testified that the need to miss work, arrive late, or leave early "four times per month consistently" would preclude competitive employment. (*Id.* at PageID 93.) Further, the VE testified that the typical employer tolerance for off-task behavior is "up to [ten percent] of the day off task." (*Id.*) As for absenteeism, the VE testified:

> An employer will typically tolerate one to two absences per month only during a short probationary period of [thirty] to [sixty] days, but then after that, even one absence a month on an ongoing consistent basis would be met with reprimand up to termination. So in other words, up to six absences per year may be tolerated, and anything more than that would be work-preclusive. And I want to note that I consider arriving late or leaving early as a full missed day towards that tolerance.

(*Id.* at PageID 93-94.)

## IV.    LAW AND ANALYSIS

Plaintiff alleges several assignments of error: (1) the sedentary jobs that the ALJ cited at Step 5 are semi-skilled, not unskilled (SE, Doc. No. 7 at PageID 3650); (2) the ALJ did not build an "accurate and logical bridge" between the medical records and his RFC, because he erred in his analysis of the medical opinion evidence and failed to appropriately evaluate Plaintiff's nonexertional limitations (*id.* at PageID 3651-56); (3) the ALJ failed to properly evaluate Plaintiff's subjective complaints under Social Security Ruling (SSR) 16-3p (*id.* at PageID 3656-59); and (4) the ALJ failed to carry the Step 5 burden because he provided "improper hypotheticals to the vocational expert." (*Id.* at PageID 3660.) For the reasons discussed below, the undersigned concludes that several of Plaintiff's assertions are well-taken and therefore **RECOMMENDS** that the ALJ's decision be reversed and remanded.

**B.** **The ALJ's RFC Is Unsupported By Substantial Evidence.**

1. **Applicable law**

A claimant's RFC describes the most she can do in a work setting despite her physical and mental limitations. 20 C.F.R. § 404.1545(a)(1). Determination of the RFC is a task reserved for the ALJ. 20 C.F.R. § 404.1546(c); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) ("[T]he ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an 'assessment of his [RFC]'"). When formulating the RFC, the ALJ must consider the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). The ALJ must base the RFC on all relevant evidence in the record, including the claimant's descriptions of her limitations and symptoms, objective medical evidence, medical opinions, other medical evidence, evidence from non-medical sources, and prior administrative medical findings. *See* 20 C.F.R. § 404.1545(a)(1)-(5).

Significantly, an ALJ is required "to show his or her work." *Scott K. v. Comm'r of the SSA*, No. 3:21-CV-00129, 2022 U.S. Dist. LEXIS 175673, at *11 (S.D. Ohio Sept. 27, 2022) (Silvain, M.J.) (internal citation omitted). An ALJ must "build an accurate and logical bridge between the evidence and his conclusion." *Amber S. v. Comm'r of the SSA,* No. 2:22-cv-2240, 2023 U.S. Dist. LEXIS 171553, at *12 (S.D. Ohio Sept. 26, 2023) (Silvain, M.J.) (citing *Fleischer v. Astrue*, 77 F. Supp. 2d 875, 877 (N.D. Ohio 2011)). An ALJ also "must articulate with specificity reasons for the findings and conclusions that he or she makes." *Bailey v. Comm'r of Soc. Sec.*, No. 98-3061, 1999 U.S. App. LEXIS 12674, 1999 WL 96920, at *4 (6th Cir. Feb. 2, 1999); *accord Hurst v. Sec'y of Health &*

11

*Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (articulation of reasons for disability decision essential to meaningful appellate review); SSR 82-62, 1982 WL 31386, at *4 (S.S.A. Jan. 1, 1982) (the "rationale for a disability decision must be written so that a clear picture of the case can be obtained").

Accordingly, "[t]his Court cannot uphold an ALJ's decision, even if there if there is enough evidence in the record to support the decision, where the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877 (cleaned up) (internal quotations and citation omitted). *See also Hardiman v. Comm'r of Soc. Sec.*, No. 2:12-CV-00508, 2013 U.S. Dist. LEXIS 99023, at *15 (S.D. Ohio July 16, 2013) (Preston Deavers, M.J.) (remanding case on the ground that "the ALJ's decision is internally inconsistent and incomplete").

### 2. The ALJ did not build a logical bridge between the evidence of Plaintiff's physical impairments and the RFC.

The ALJ provided only a cursory explanation of why he limited Plaintiff to the reduced range of light work in the RFC. That cursory explanation did not address how the RFC limitations account for Plaintiff's severe physical impairments, including the non-exertional restrictions caused by Plaintiff's impairments. Because the ALJ's decision did not build a logical bridge between the evidence and the ALJ's conclusions about Plaintiff's severe physical impairments, reversal is warranted.

The ALJ provided a detailed, chronological summary of the medical evidence relating to Plaintiff's endometriosis, EDS, fibromyalgia, POTS, and gastroparesis. (Decision, Doc. No. 6-2 at PageID 41-45.) The ALJ described Plaintiff's conditions, as

12

well as Plaintiff's treatment prior to and since the alleged disability onset date. (*Id.*) For example, the ALJ noted that Plaintiff underwent an exploratory laparotomy in 2018 and received Lupron injections in 2021 for endometriosis. (*Id.* at PageID 41 (citing, e.g., AR, Doc. No. 6-7 at PageID 396, 399, 445).) The ALJ acknowledged that shortly prior to the alleged onset date in March 2022, Plaintiff decided to stop Lupron because of "her multiple side effects." (*Id.* (citing AR, Doc. No., 6-7 at PageID 380).) Although Plaintiff reported that her pelvic pain was "stable," Plaintiff's gynecologist advised Plaintiff that it was "okay for [her] to stop endometriosis treatment and focus on EDS, which was thought a likely factor to her chronic pelvic pain." (*Id.* (citing AR, Doc. No. 6-7 at PageID 382).) The ALJ also acknowledged that Plaintiff's nurse noted "excessive frequent menstruation" in June 2022. (*Id.* at PageID 42 (citing AR, Doc. No. 6-21 at PageID 1617).) The ALJ cited an August 2022 treatment note that showed Plaintiff was still not receiving any treatment for endometriosis. (*Id.* (citing AR, Doc. No. 6-21 at PageID 1630).)

Finally, the ALJ cited an October 2023 gynecology treatment note that showed normal findings. (*Id.* (citing AR, Doc. No. 6-33 at PageID 3643).) The ALJ failed to mention, however, that Plaintiff's gynecologist also documented Plaintiff's subjective complaints—including the complaint that her symptoms were worsening—in the October 2023 treatment note. (*See* AR, Doc. No. 6-33 at PageID 3640.) Plaintiff reported that her endometriosis had been "getting worse again" and described "struggles with some bladder issues – similar to prior to her last endometriosis surgery," "episodes of loss of urine at times," and increased pain. (*Id.*) She also said that the first three days of her

13

menstrual period were "extremely bad[,] requiring [her] to be in a tub and unable to otherwise function with daily activities." (*Id.*)

Next, the ALJ addressed Plaintiff's EDS and summarized her treatment prior to the alleged disability onset date. (Decision, Doc. No. 6-2 at PageID 42.) The ALJ noted that in January 2022, Plaintiff reported pain from rib dislocation that occurred "four to five times a day for the past eight months." (*Id.* (citing AR, Doc. No. 6-7 at PageID 391).) The ALJ acknowledged that Plaintiff began physical therapy in March 2022 for complaints of muscle weakness, cervicalgia, low back pain, hip pain, knee pain, and shoulder pain. (*Id.* (citing AR, Doc. No. 6-22 at PageID 1683).) He also acknowledged that Plaintiff's physical therapist documented several abnormalities such as hypermobility in the joints, instability of the hands and fingers, and likely underlying arthritic conditions. (*Id.* (citing AR, Doc. No. 6-22 at PageID 1686).)

The ALJ cited subsequent records that showed that Plaintiff continued to complain of pain despite receiving physical therapy. (*Id.* at PageID 43.) For example, the ALJ noted that as of April 2022, Plaintiff had made only "some progress regarding her core" and was "progressing very slowly." (*Id.* (citing AR, Doc. No. 6-22 at PageID 1748).) In May 2022, Plaintiff said she cut back her Celebrex dosage because of a reaction that caused dizziness, nausea, and palpitations. (*Id.* (citing AR, Doc. No. 6-22 at PageID 1761).) Plaintiff also complained of left knee stiffness and intolerance to palpation, left neck spasms, and "giving out" of her ankles and knees despite doing home exercises and going to the gym daily. (*Id.* (citing AR, Doc. No. 6-22 at PageID 1762; AR, Doc. No. 6-23 at PageID 1839).) Plaintiff's primary care nurse noted in December 2022 that Plaintiff

14

was having trouble with exercising and physical therapy due to her "inability to put on weight," and recommended medical massage therapy. (*Id.* (citing AR, Doc. No. 6-27 at PageID 2886).) Plaintiff reported in March 2023 that her EDS symptoms had been "really bad [with] more dislocations" and were disrupting her sleep. (*Id.* (citing AR, Doc. No. 6-19 at PageID 1398).) She also reported back pain and cervical spine instability, despite the fact that x-rays of the spine were unremarkable. (*Id.* (citing AR, Doc. No. 6-26 at PageID 2832; AR, Doc. No. 6-27 at PageID 2915; AR, Doc. No. 6-30 at PageID 3206).) The ALJ acknowledged that Plaintiff reported bilateral wrist pain in May 2023, and that she complained of worsening neck pain, cervicalgia, and headaches in August 2023. (*Id.* (citing AR, Doc. No. 6-32 at PageID 3444, 3446, 3465).)

The ALJ then summarized Plaintiff's treatment for fibromyalgia and POTS. (Decision, Doc. No. 6-2 at PageID 43-44.) The ALJ acknowledged that although Plaintiff's primary care nurse and rheumatologist indicated that her chronic pain could be attributed, at least in part, to EDS, Plaintiff nevertheless complained of symptoms including fatigue, chronic and acute pain, deconditioning, nonrestorative sleep, headaches, and intermittent brain fog. (*Id.* at PageID 44 (citing AR, Doc. No. 6-7 at PageID 369, 371; AR, Doc. No. 6-20 at PageID 1578).) An autoimmune workup in May 2022 was negative, and Plaintiff's rheumatologist noted that her symptoms were consistent with fibromyalgia and underlying EDS. (*Id.* (citing AR, Doc. No. 6-7 at PageID 356).) The ALJ acknowledged that Plaintiff reported dizziness, nausea, and palpitations after she started a trial of Celebrex. (*Id.* (citing AR, Doc. No. 6-7 at PageID 354).) The ALJ further acknowledged that Plaintiff again complained of fatigue,

difficulty sleeping, and brain fog in December 2022. (*Id.* (citing AR, Doc. No. 6-19 at PageID 1385).) As for POTS, the ALJ noted that Plaintiff's therapist recommended conservative management after Plaintiff complained of increased dizziness in August 2022. (*Id.* (citing AR, Doc. No. 6-23 at PageID 1890).) The ALJ also noted that Plaintiff reported no problems with walking in September 2022, but did complain of difficulty with prolonged standing, as well as falls resulting from dizziness. (*Id.* (citing AR, Doc. No. 6-24 at PageID 1918).)

Finally, the ALJ addressed Plaintiff's history of gastroparesis. (Decision, Doc. No. 6-2 at PageID 44-45.) The ALJ noted that although Plaintiff did not report any gastrointestinal symptoms around the alleged onset date, she began complaining of "worsening problems with keeping food down" in August 2022. (*Id.* at PageID 44 (citing AR, Doc. No. 6-8 at PageID 608; AR, Doc. No. 6-21 at PageID 1638).) The ALJ acknowledged that in December 2022, Plaintiff complained of stomach pain, cramping, and vomiting (*id.* (citing AR, Doc. No. 6-19 at PageID 1384-85)), and a gastric emptying study showed delayed gastric emptying. (*Id.* (citing AR, Doc. No. 6-33 at PageID 3626).) The ALJ cited subsequent records that showed that Plaintiff reported being able to tolerate some foods, that her weight had "leveled out" and she was engaging in moderate aerobic exercises, and that her bowel movements had been "better with less diarrhea and constipation." (*Id.* at PageID 44-45 (citing AR, Doc. No. 6-19 at PageID 1389-91, 1395, 1398-99; AR, Doc. No. 6-25 at PageID 2023).)

According to the ALJ, in the most recent records that were dated in June 2023, Plaintiff's gastroenterologist noted that her gastroparesis "appear[ed] to be hormonal and

related to her endometriosis." (*Id.* at PageID 45 (citing AR, Doc. No. 6-33 at PageID 3613).) The ALJ also cited the gastroenterologist's note that Plaintiff had "adjusted her food intake resulting in weight gain." (*Id.* (citing AR, Doc. No. 6-33 at PageID 3613).) But the ALJ failed to acknowledge the note from Plaintiff's gastroenterologist that Plaintiff had lost 115 pounds over the past three to four years, and had gained only approximately seven pounds in the past three months. (AR, Doc. No. 6-33 at PageID 3612.) Additionally, despite Plaintiff's weight gain, she continued to complain of abdominal pain and nausea. (*Id.*)

The ALJ explained that the RFC limitations for light work with frequent climbing of ramps and stairs, stooping, kneeling, and crouching accounted for Plaintiff's "gastroparesis and low nutrition status as well as EDS complicated by fibromyalgia and POTS." (Decision, Doc. No. 6-2 at PageID 46.) The ALJ stated that he limited Plaintiff to occasional crawling "to avoid positional orthostatic complications" from POTS. (*Id.*) The ALJ further explained: "[D]ue to her EDS and POTS, as well as additional challenges from her endometriosis and gastroparesis including abdominal pain as well as incontinence issues per her testimony, for additional precautions, she should have no exposure to commercial driving, hazardous moving machinery, or unprotected heights; she could occasionally climb ladder[s], ropes, [and] scaffolds." (*Id.*)

Defendant argues that substantial evidence supports the ALJ's RFC determination. (Mem. In Opp., Doc. No. 10 at PageID 3671-79.) The undersigned disagrees. It is true that the ALJ provided a detailed discussion of the medical evidence pertaining to Plaintiff's physical impairments and also addressed the medical opinion evidence. (Mem.

In Opp., Doc. No. 10 at PageID 3672-79 (citing Decision, Doc. No. 6-2 at PageID 46-51).) However, the ALJ did not explain *how* the RFC accommodates Plaintiff's physical impairments. (Decision, Doc. No. 6-2 at PageID 46.) Specifically, he did not consider or account for Plaintiff's pain during EDS-related joint subluxations, chronic pain and fatigue associated with EDS and fibromyalgia, or episodes of nausea and vomiting during gastroparesis exacerbations. (*See* SE, Doc. No. 7 at PageID 3655-56.) Instead, he summarily concluded that light work with the other non-exertional limitations in the RFC accounted for Plaintiff's physical impairments:

> In sum, the above residual functional capacity assessment is supported by the analyses of the medical opinions, the objective medical evidence of record, and [Plaintiff's] testimony, and documented subjective reports. [Plaintiff] retains the ability to perform work within the parameters of the above residual functional capacity, which has been calibrated to accommodate her mental and physical impairments.

(Decision, Doc. No. 6-2 at PageID 51.) Because the ALJ's decision does not build a logical bridge between the evidence regarding Plaintiff's physical impairments and the RFC, reversal is warranted.

Defendant argues that the Court cannot reverse the ALJ's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion." (Mem. In Opp., Doc. No. 10 at PageID 3680 (citing *Smith v. Comm'r of Soc. Sec.*, No. 3:15cv00384, 2017 WL 427359, at *7 (S.D. Ohio Feb 1, 2017) (Ovington, M.J.).) This assertion, while true, misses the mark. The law does "presuppose[] that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen*, 800 F.2d at 545; *see also White*, 572 F.3d at 282. And the ALJ's

18

decision "need not be so comprehensive as to account with meticulous specificity for each finding and limitation, nor is the ALJ required to discuss every piece of evidence in the record." *Correa v. Comm'r of Soc. Sec.*, No. 1:23-cv-685, 2023 U.S. Dist. LEXIS 231766, at *31 (N.D. Ohio Dec. 14, 2023) (citing *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)).

Nevertheless, the ALJ must "build an accurate and logical bridge between the evidence and his conclusion." *Amber S.*, 2023 U.S. Dist. LEXIS 171553, at *12. *See also Julie P. v. Comm'r of Soc. Sec.*, No. 2:21-cv-4170, 2022 U.S. Dist. LEXIS 116490, at *13 (S.D. Ohio June 30, 2022) (Jolson, M.J.) (citation omitted), *report and recommendation adopted*, No. 2:21-cv-4170, 2022 U.S. Dist. LEXIS 138572 (S.D. Ohio Aug. 3, 2022) (Morrison, D.J.), *aff'd*, *Pettit v. Comm'r of Soc. Sec.*, No. 22-3826, 2023 U.S. App. LEXIS 10964 (6th Cir. 2023); *Alevras v. Colvin,* No. 13 C 8409, 2015 U.S. Dist. LEXIS 59394, *12 (N.D. Ill. May 6, 2015) ("merely summarizing medical evidence is not the same as analyzing it and explaining how the evidence supports the conclusion that the claimant is not disabled") (citation omitted). Here, the ALJ's failure to build a logical bridge between the cited evidence and his conclusions prevents the Court from engaging in meaningful judicial review, which necessitates a remand. *See Blakley*, 581 F.3d at 409 (citing *Wilson v. Comm'r of Soc. Sec,* 378 F.3d 541, 544 (6th Cir. 2004)).

### 3.    The ALJ's error is not harmless.

The ALJ's failure to explain the basis for his conclusions is not harmless. Plaintiff argues that the evidence supports stricter RFC limitations that would be work-preclusive (SE, Doc. No. 7 at PageID 3660), and the record confirms this claim. The VE testified at

the October 2023 hearing that a hypothetical individual of Plaintiff's age, education, work experience, and RFC—but with a more restrictive limitation that the individual needed to "get up and walk around periodically" (defined as every twenty minutes for five minutes at a time while being off task) would preclude competitive employment. (AR, Doc. No. 6-2 at PageID 92-93.) The VE also testified that an individual who needed to miss work, arrive late, or leave early "four times per month consistently" would not be able to perform competitive employment. (*Id.* at PageID 93.) The evidence in the record could support these restrictive limitations. Therefore, the ALJ's failure to adequately explain his decision to limit Plaintiff to light work in the RFC is not a harmless error

### C. The ALJ Reversibly Erred In Evaluating Plaintiff's Symptom Severity.

#### 1. Applicable law

Reversal is also warranted because the ALJ erred when evaluating Plaintiff's symptom severity. The ALJ's evaluation of Plaintiff's symptoms was governed by a detailed Social Security regulation (20 C.F.R. § 404.1529) and SSR 16-3p, which mandates a two-step process for evaluating an individual's symptoms. SSR 16-3p, 2017 WL 5180304, *3 (S.S.A. revised and republished Oct. 25, 2017).[7]

At the first step, the ALJ must "determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms." SSR 16-3p at *3. The ALJ must base this determination upon objective medical evidence in the form of medical signs or laboratory findings. *Id.*

---

[7] Although SSRs do not have the same force and effect as statutes or regulations, they are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(1).

Medical signs are "anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques that can be observed apart from an individual's symptoms." *Id*. The ALJ will not, however, consider whether the objective medical evidence supports the alleged severity of the individual's symptoms. *Id*.

At the second step, the ALJ must "evaluate the intensity and persistence of an individual's symptoms . . . and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." SSR 16-3p at *9. Among other things, the ALJ must decide whether the alleged symptoms and accompanying limitations are consistent with the evidence in the record. SSR 16-3p at *8. The Social Security Administration "recognize[s] that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence." *Id*. The ALJ must therefore examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id*. at *9. Further, when determining whether an individual's statements are consistent with her symptoms, the ALJ will keep in mind that the individual's statements may themselves be inconsistent because "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time." *Id*. at *8-9.

When evaluating the intensity, persistence and limiting effects of the claimant's alleged symptoms, the ALJ must consider the following factors:

1.  Daily activities;

2.  The location, duration, frequency, and intensity of pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6.  Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.  Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p at *7-8. The ALJ need only discuss those factors that are pertinent based upon the evidence in the record. *Id*. However, the ALJ's discussion of the applicable factors "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10.

The ALJ will also consider whether the individual sought medical treatment and followed the treatment that was prescribed. SSR 16-3p at *9. Attempts to obtain treatment may show that symptoms are intense and persistent; conversely, a lack of such efforts may show that an individual's symptoms are not intense or persistent. *Id*. Similarly, "if the individual fails to follow prescribed treatment that might improve

symptoms, [the ALJ] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id*.

However, the ALJ "will not find an individual's symptoms inconsistent . . . on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p at *9. The SSR explains, for example, that individuals may not seek or follow treatment due to side effects from medications, an inability to afford treatment, or an inability to understand the need for treatment due to a mental impairment. *Id*. at *9-10. The ALJ may need to contact the claimant—or to question the claimant at the administrative hearing—to ascertain the reason(s) for the lack of treatment. *Id*. at *9. The ALJ "***will*** explain how [he or she] considered the individual's reasons" in the evaluation of the individual's symptoms. *Id.* at *10 (emphasis added); *cf. Dooley v. Comm'r of Soc. Sec*., 656 F. App'x 113, 119 (6th Cir. 2016) (the ALJ must consider the reasons for not obtaining treatment "before drawing an adverse inference from the claimant's lack of medical treatment.").

### 2. The ALJ's symptom severity analysis is unsupported by substantial evidence.

Plaintiff asserts that the ALJ erred when he evaluated Plaintiff's symptom severity and that his analysis is unsupported by the record. (SE, Doc. No. 7 at PageID 3656-59.) For the reasons discussed below, the undersigned finds that this assertion is well-taken. Remand is therefore warranted.

The ALJ discounted Plaintiff's symptom severity, in part, because he concluded that Plaintiff's allegations were "not entirely consistent with the medical evidence and

other evidence in the record." (Decision, Doc. No. 6-2 at PageID 46.) In making this

conclusion regarding Plaintiff's EDS, the ALJ cited several normal x-ray reports that

were dated between February 2022 and March 2023. (*Id.* at PageID 46.) The ALJ also

stated that Plaintiff had attended physical therapy for "various joints" and concluded that

Plaintiff's EDS was "overall . . . managed conservatively." (*Id.*)

      The ALJ cited no additional evidence to support his conclusion that Plaintiff's

EDS-related complaints were not entirely consistent with the evidence in the record.

(Decision, Doc. No. 6-2 at PageID 46.) The ALJ did provide a detailed summary of the

medical evidence related to EDS earlier in the RFC analysis, as discussed above. (*Id.* at

PageID 42-43.) But the ALJ only considered the normal x-ray reports and Plaintiff's

physical therapy when he evaluated the consistency of Plaintiff's EDS complaints with

other evidence in the record and concluded that EDS was managed conservatively. The

ALJ's analysis constitutes reversible error for several reasons.

      <u>First</u>, the ALJ erred by relying heavily on normal imaging in the record to discount

Plaintiff's EDS complaints. District courts in this circuit and the Seventh Circuit have

viewed EDS as analogous to fibromyalgia and found that ALJs inappropriately relied on

the absence of objective support for EDS to discount complaints of pain. *Coffee v.*

*Berryhill*, No. 3:17-CV-852-PPS/MGG, 2019 WL 302680, at *2-3 (N.D. Ind. Jan. 22,

2019); *Austin v. Colvin*, No. 13 C 7257, 2014 WL 6807841, at *4 (N.D. Ill. Dec. 2,

2014); *Haley v. Saul*, No. 3:20-CV-282 DRL, 2021 WL 3400804, at *4 (N.D. Ind. Aug.

4, 2021); *Gibson v. Kijakazi*, No. 5:20-CV-00189-LLK, 2021 WL 5828035, at *2-3

(W.D. Ky. Dec. 8, 2021). Several of these courts have cited the Ehlers-Danlos National Foundation's description of EDS' symptoms and causes:

> Chronic pain is a well-established and cardinal manifestation of Hypermobility EDS and it is common for pain to be out of proportion to physical and radiological findings. The origin of the pain is not clearly understood, but some of the likely causes include muscle spasm (tender points are sometimes present) and degenerative arthritis; neuropathic pain is also common.

*Coffee*, 2019 WL 302680, at *2; *Austin*, 2014 WL 6807841, at *4.

The undersigned agrees with the reasoning in the above-cited cases and finds that the SSA's evaluation criteria for fibromyalgia should apply to Plaintiff's EDS. SSR 12-2p governs an ALJ's consideration of fibromyalgia in the Sequential Evaluation and instructs that fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p; Titles II and XVI: Evaluation of Fibromyalgia, 2012 WL 3104869, at *2 (S.S.A. July 25, 2012). The Sixth Circuit has noted that "the nature of fibromyalgia itself renders such a brief analysis and over-emphasis upon objective findings inappropriate." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (citing *Canfield v. Comm'r of Soc. Sec.*, No. CIV.A.01–CV–73472–DT, 2002 WL 31235758, at *1 (E.D. Mich. Sept.13, 2002) (it would be "nonsensical to discount a fibromyalgia claimant's subjective complaints of pain based upon lack of objective medical evidence, as such evidence is generally lacking with fibromyalgia patients")). The same reasoning applies to EDS, "where laboratory, x-ray, or physical findings might not necessarily indicate the level of pain suffered." *Coffee*, 2019 WL 302680, at *3.

25

Here, the ALJ discredited Plaintiff's subjective complaints about her EDS symptoms because they were not objectively verified by x-rays and other imaging. (*See* Decision, Doc. No. 6-2 at PageID 45.) Because EDS is similar to fibromyalgia, the undersigned concludes that the ALJ impermissibly relied upon a lack of supporting objective evidence to minimize the severity of the symptoms of EDS.

Second, when the ALJ cited the lack of supporting objective imaging to discount Plaintiff's EDS complaints, he impermissibly ignored numerous treatment notes that documented findings consistent with those complaints. The ALJ did not consider, for example, the March 2022 initial physical therapy evaluation report that documented abnormalities such as pain with palpation of the lumbar paraspinal muscles, knees, and greater trochanters, impaired proprioception in the legs, impairment of the ankles and knees upon a balance assessment, difficulty with squatting due to increased lumbar lordosis and pain and instability in the right knee, pain upon cervical range of motion, and decreased strength in the bilateral hips, knees, and ankles. (AR, Doc. No. 6-7 at PageID 383-84.) Also, during an EDS assessment in March 2022, Nicole Bishwaty, C.N.P. documented pes planus (i.e., flat feet), piezogenic papules, mild hyperelasticity, striae distensae (stretch marks), and a Beighton score of nine (which is the highest level of joint hypermobility). (AR, Doc. No. 6-7 at PageID 377.) Rheumatology progress notes from March and May 2022 documented a reversible deformity of a few digits on the left hand, a few tender joints in the hands, and tenderness to palpation of the Achilles tendon and ankle. (AR, Doc. No. 6-7 at PageID 358, 371.)

Plaintiff's physical therapist noted in June 2022 that Plaintiff responded well to a gym routine, and he expected her joint pain and hypermobility to improve with exercise progression. (AR, Doc. No. 6-7 at PageID 347.) But he also noted that many of Plaintiff's symptoms were related to endometriosis and fibromyalgia, and it was "unclear at this time if this pain will be affected by the exercise." (*Id.*) And Plaintiff did later complain of increased pain. In August 2022, Plaintiff's physical therapist documented her complaints of left hip pain, as well as left shoulder pain "with [a] palpable bump sticking out." (AR, Doc. No. 6-23 at PageID 1869.) Later that month, Plaintiff's physical therapist noted that her activity tolerance was "limited by pain" and that she exhibited tenderness at the left anterior talo-fibular ligament. (*Id.* at PageID 1880.) He also noted that Plaintiff was experiencing "intermittent increased pain with exercises more than usual" and complained of dizziness more often during treatment. (*Id.* at PageID 1881, 1890.)

In September 2022, Plaintiff's physical therapist noted that the session was "limited by [Plaintiff's] health status" due to her reports of "[p]assing out and having hypotension," likely because of her gastroparesis. (AR, Doc. No. 6-24 at PageID 1908-09.) Later that month, Plaintiff complained of left-sided neck pain and her physical therapist suspected a minor rotation of the C2 vertebrae to the left. (*Id.* at PageID 1928-29.) In October 2022, Plaintiff complained of global instability in the joints, and her physical therapist did not perform any upper extremity exercises "due to restrictions from ortho with [left] shoulder." (*Id.* at PageID 1951-52.) He also noted that Plaintiff had continued to lose weight, and he wanted her to "get this stabel [sic]" before she returned to physical therapy. (*Id.* at PageID 1952.)

27

More than six months later, Plaintiff returned to physical therapy in May 2023. (*See* AR, Doc. No. 6-32 at PageID 3466.) Plaintiff's subjective answers to questions on the Neck Disability Index resulted in a score of forty-five out of fifty, which indicated "severe disability." (*Id.* at PageID 3468.) Plaintiff's physical therapist documented abnormalities that were similar to those documented during the initial assessment in March 2022: decreased strength of both shoulders and elbows; decreased strength of the hips, knees, and ankles; increased lumbar lordosis; and difficulty squatting due to increased knee hinge, pain, and instability. (*Id.* at PageID 3469-70.) Later that month, Plaintiff exhibited normal range of motion but had mild edema of the left wrist. (*Id.* at PageID 3462.) Her physical therapist also documented active trigger points throughout the cervical spine and upper trapezius. (*Id.*)

In June 2023, Plaintiff's physical therapist noted that she was "significantly limited" by endometriosis symptoms. (*Id.* at PageID 3458.) Although the therapist noted later that month that Plaintiff had obtained "excellent relief" from therapy to her neck and shoulders (*id.* at PageID 3457), he documented increased cervical stiffness and spasm in July 2023. (*Id.* at PageID 3450.)

Additionally, primary care records that were dated throughout the relevant time period showed ecchymosis and decreased range of motion of the right ankle, motor weakness, cervical adenopathy, cervical tenderness and spasms, pain with cervical movement, swelling and deformity of the left wrist, and decreased range of motion, swelling, and tenderness of the right foot. (AR, Doc. No. 6-7 at PageID 354; AR, Doc.

No. 6-25 at PageID 2404, 2454; AR, Doc. No. 6-26 at PageID 2829; AR, Doc. No. 6-32 at PageID 3465, 3475.)

The ALJ ignored all this evidence—which supports Plaintiff's subjective complaints—when he analyzed her symptom severity. The ALJ also mischaracterized the medical evidence related to Plaintiff's EDS when he stated that her symptoms were "managed" with conservative treatment. (Decision, Doc. No. 6-2 at PageID 45.) The evidence discussed above—which documents continued complaints of significant pain and other symptoms despite the fact that Plaintiff participated in physical therapy sessions for approximately fifteen months (albeit with a break in treatment to address her gastroparesis-related nutrition issues) and regularly followed up with her primary care provider and a rheumatologist—demonstrates that Plaintiff's EDS symptoms were not, in fact, managed with conservative treatment.

Third, the ALJ erred by failing to explain why he discounted Plaintiff's complaints about her other physical conditions. The ALJ acknowledged that Plaintiff's medical records documented her subjective reports of chronic widespread pain and brain fog, as well as joint swelling and myalgia upon physical examinations. (Decision, Doc. No. 6-2 at PageID 46.) He acknowledged Plaintiff's recommended treatment for POTS and her "low nutrition status" related to gastroparesis. (*Id.*) The ALJ further acknowledged that Plaintiff discontinued injections for endometriosis because of "side effects and concerns over complications." (*Id.*) He noted that Plaintiff took Diazepam and suppository medication for the condition. (*Id.*) But the ALJ did not cite to any evidence or provide any reasoning to discount Plaintiff's subjective complaints about these conditions. A

29

reasonable mind would not accept the evidence that the ALJ cited as adequate to support the ALJ's conclusion that her subjective complaints about fibromyalgia, POTS, gastroparesis, and endometriosis were not entirely consistent with the record.

In sum, the ALJ's failure to acknowledge significant evidence that supports Plaintiff's subjective complaints, combined with his mischaracterization of the evidence that he chose to cite, signifies an impermissibly selective review of the record. *See Gentry*, 741 F.3d at 723-23 (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports")). The Court recognizes that the ALJ is not required to directly address every piece of evidence and finding in the record. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 n.11 (6th Cir. 2014). Nevertheless, the ALJ's "factual findings as a whole must show that he implicitly resolved" any conflicts in the evidence. *Id.* Here, the ALJ's apparent failure to consider significant evidence that contradicts his conclusions shows that the ALJ did not resolve the conflicts in the evidence. For these reasons, the undersigned concludes that the ALJ's findings regarding Plaintiff's symptom severity are not supported by substantial evidence.

> **D.** **The ALJ's Step Five Finding Is Not Supported By Substantial Evidence.**

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). Determination of the RFC is a task reserved for the ALJ. 20

C.F.R. § 404.1546(c). The ALJ must base the RFC on all relevant evidence in the record.
20 C.F.R. § 404.1545(a)(1). This includes objective medical evidence, medical opinions,
other medical evidence, evidence from non-medical sources, and prior administrative
medical findings. *See* 20 C.F.R. § 404.1545(a)(1)-(5). Once an ALJ determines that a
plaintiff's RFC prevents the performance of her past relevant work, the burden shifts to
the Commissioner to show that Plaintiff is able to "perform other substantial gainful
activity that exists in the national economy." *Varley v. Sec'y of Health & Hum. Servs.*,
820 F.2d 777, 779 (6th Cir. 1987) (citations omitted). To meet this burden, the ALJ must
find that a plaintiff has the "vocational qualifications to perform specific jobs," and this
finding must be "supported by substantial evidence." *O'Banner v. Sec'y of Health, Ed. &
Welfare*, 587 F.2d 321, 323 (6th Cir. 1978) (citation omitted). An ALJ may also rely on
the testimony of a VE. 20 C.F.R. §§ 404.1560(b)(2), 404.1566(e). "Substantial evidence
may be produced through reliance on the testimony of a VE in response to a
'hypothetical' question, but only 'if the question accurately portrays [Plaintiff's]
individual physical and mental impairments.'" *Varley*, 820 F.2d at 779 (6th Cir. 1987)
(citations omitted).

Plaintiff asserts two errors regarding the ALJ's Step Five finding. First, Plaintiff
asserts that the ALJ erred because the sedentary jobs that he cited at Step Five are semi-
skilled, not unskilled. (SE, Doc. No. 7 at PageID 3650.) This assertion is not well-taken.

The Social Security regulations define semi-skilled work as follows:

Semi-skilled work is work which needs some skills but does not require
doing the more complex work duties. Semi-skilled jobs may require
alertness and close attention to watching machine processes; or inspecting,

> testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work.

20 C.F.R. § 404.1568. The ALJ's RFC limits Plaintiff to concentrating, persisting, and maintaining pace for two-hour intervals during a normal workday/workweek "while performing detailed and complex tasks," as well as adapting to occasional changes in the workplace. (Decision, Doc. No. 6-2 at PageID 39.) These limitations are not, on their face, inconsistent with the regulatory definition of semi-skilled work. Additionally, as stated above the VE testified that she relied on her "education, training, and experience" when she provided the cited jobs and considered areas that were not addressed by the DOT. (AR, Doc. No. 6-2 at PageID 94.) The ALJ discussed this testimony in his decision. (Decision, Doc. No. 6-2 at PageID 52.) The VE's testimony is therefore consistent with the regulations.

Moreover, even if the ALJ erred as Plaintiff alleges, the error would be harmless. The VE identified three light jobs that are unskilled (SVP level of 2) that the hypothetical individual could perform: Cashier, Marker, and Routing Clerk. (AR, Doc. No. 6-2 at PageID 89-90.) The ALJ cited these jobs to support his conclusion that Plaintiff was "not disabled" at Step Five. (Decision, Doc. No. 6-2 at PageID 52.) Plaintiff does not argue that these light jobs are more restrictive than the RFC. The light jobs cited by the VE— without considering the sedentary jobs—constitute substantial evidence to support the ALJ's Step Five finding.

However, the undersigned finds that Plaintiff's argument that "the ALJ did not carry his step 5 burden" (SE, Doc. No. 7 at PageID 3660) is well-taken. Plaintiff argues, and the undersigned agrees, that the RFC does not fully account for her nonexertional limitations and should have included limitations for "the use of the splints on the joints, including the hands and fingers; avoiding men due to the PTSD; the fatigue and need for rest, the restricted ADL's; missing more than six days of work a year and being off task more than 10% of the work day." (SE, Doc. No. 7 at PageID 3660.)

Defendant contends that the ALJ met the Step Five burden by "identifying jobs that Plaintiff could perform despite her limitations by obtaining vocational expert testimony." (Mem. In Opp., Doc. No. 10 at PageID 3681.) The undersigned disagrees. As discussed above, the ALJ's factual findings regarding Plaintiff's physical impairments and her subjective symptoms are not supported by substantial evidence. The ALJ's RFC therefore does not accurately portray Plaintiff's impairments and limitations. And so it follows that the VE's testimony in response to the ALJ's hypothetical question—which mirrored the RFC—does not constitute substantial evidence to support the ALJ's Step Five finding. *Varley*, 820 F.2d at 779; *see also Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). Accordingly, the ALJ's Step Five analysis constitutes reversible error and provides another reason to remand this case.

## V.    REMAND

Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand

under Sentence Four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is neither overwhelming nor strong while contrary evidence is lacking. *Faucher*, 17 F.3d at 176. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of Section 405(g) for the reasons stated above. On remand, the ALJ should further develop the record as necessary, particularly as to the Plaintiff's subjective complaints and her physical limitations, and evaluate the evidence of record under the applicable legal criteria mandated by the Commissioner's regulations and rulings and governing case law. The ALJ should evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for Child's Insurance Benefits and SSI should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

    1.    Plaintiff's Statement of Errors (Doc. No. 7) be GRANTED;

    2.    The Court REVERSE the Commissioner's non-disability determination;

    3.    No finding be made as to whether Plaintiff was under a "disability" within the meaning of the Social Security Act;

4.    This matter be REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Order; and

5.    This case be terminated on the Court's docket.

 *s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).